# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| VIRGINIA S. VARBLE,<br>    Plaintiff | ) <br> ) <br> ) | |
| v. | ) <br> ) <br> ) | Civil Action No. 2:09cv00073 <br> **REPORT AND** <br> **RECOMMENDATION** |
| MICHAEL J. ASTRUE,<br> Commissioner of Social Security,<br>    Defendant | ) <br> ) <br> ) | <br> By: PAMELA MEADE SARGENT <br> United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Virginia S. Varble, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Varble protectively filed her applications for DIB and SSI on March 2, 2007, alleging disability as of February 28, 2007, due to left knee problems, carpal tunnel syndrome, headaches, anxiety, depression, suicidal thoughts, problems sleeping and an eye condition. (Record, ("R."), at 130-36, 147, 156, 204.) The claims were denied initially on all levels of administrative review. (R. at 91-93, 98-100, 104, 106-08, 110-14, 116-17.) Varble then requested a hearing before an administrative law judge, ("ALJ"). (R. at 118.) The ALJ held a hearing on April 30, 2008, at which Varble was represented by counsel. (R. at 16-50.)

By decision dated September 4, 2008, the ALJ denied Varble's claims. (R. at 9-15.) The ALJ found that Varble met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 13.) The ALJ also found that Varble had not engaged in substantial gainful activity since February 28, 2007. (R. at 13.) The ALJ determined that the medical evidence established that Varble had severe impairments, namely carpal tunnel syndrome, obesity and depression/anxiety, but he found that Varble's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ found that Varble's allegations regarding her limitations were not totally credible. (R. at 14.) The ALJ also found that Varble had

the residual functional capacity to perform unskilled sedentary[1] work performed in a quiet environment with little interaction with supervisors and co-workers. (R. at 14.) The ALJ found that Varble could not perform her past relevant work. (R. at 14.) Based on Varble's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Varble could perform, including jobs as a pharmaceutical assembler, an office clerk and a toy stuffer. (R. at 14.) Thus, the ALJ found that Varble was not under a disability as defined under the Act and was not eligible for benefits (R. at 14.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2010).

After the ALJ issued his decision, Varble pursued her administrative appeals, (R. at 5), but the Appeals Council denied her request for review. (R. at 1-4.) Varble then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2010). The case is before this court on Varble's motion for summary judgment filed May 3, 2010, and the Commissioner's motion for summary judgment filed June 2, 2010.

## II. Facts

Varble was born in 1976, (R. at 130), which classifies her as a "younger

---

[1] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2010).

person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2010). She has a high school education and attended special education classes. (R. at 162, 223.) Varble has past relevant work experience as an assembly line worker, a summer helper for a school youth program and as a caterer's assistant. (R. at 23, 157, 165.)

James B. Williams, a vocational expert, was present and testified at Varble's hearing. (R. at 38-47.) Williams classified Varble's past work as a catering assistant as light[2] and semiskilled. (R. at 38.) Williams classified Varble's job as a summer helper for the summer youth program as heavy[3] and unskilled. (R. at 38-39.) Williams was asked to consider an individual of Varble's age, education and past work experience, who could occasionally lift and carry items weighing up to 20 pounds and up to 10 pounds frequently, who could stand up to two hours in a eight-hour workday, but no more then 20 minutes at a time in one-hour increments, who could sit for up to six hours in an eight-hour workday, who would require up to a 15-minute break at two-hour intervals, who required a semi-quiet environment that required minimal interaction with supervisors or co-workers, who could occasionally engage in any of the postural positions except for climbing ropes or scaffolds and who would miss, on average, one day of work a month. (R. at 39-40.) Williams stated that there would be jobs available that existed in significant numbers that such an individual could perform, including jobs as a pharmaceutical assembler, an office clerk and an animal

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2010).

[3]Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, she also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2010).

toy stuffer. (R. at 40.) Williams was asked to consider the same hypothetical individual, but who would miss two days of work a month. (R. at 40-41.) He stated that there would be no jobs available that such an individual could perform. (R. at 40-41.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. Carey W. McKain, M.D.; Stone Mountain Health Services; Norton Community Hospital; Dr. Richard Surrusco, M.D., a state agency physician; Wellmont Lonesome Pine Hospital; Family Drug Center; Crystal Burke, L.C.S.W., a licensed clinical social worker; Dr. Thomas Roatsey, D.O.; Teresa Roatsey, F.N.P., a family nurse practitioner; Dr. William Kern, M.D.; and Ralph Ramsden, Ph.D., a licensed clinical psychologist. Varble's counsel submitted additional evidence from Crystal Burke; Lab Corp; and Stone Mountain Health Services to the Appeals Council.[4]

In January 2007, Varble sought treatment from Stone Mountain Health Services, ("Stone Mountain"), for complaints of recurring headaches that she had "all of her life," but which seemed to be getting worse. (R. at 259, 261.) She reported that she was seeing a lawyer and was "going to try and get on disability or change jobs." (R. at 259.) Varble denied a headache or visual disturbance. (R. at 259.) Teresa Roatsey, F.N.P., a family nurse practitioner, noted that Varble's previous CT scan of

---

[4] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-4), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

the head performed in April 2006 was negative. (R. at 241, 259.) Roatsey removed a wax impaction from Varble's ear and prescribed Motrin for headaches. (R. at 259-60.) On May 25, 2007, Varble complained of anxiety and depression. (R. at 301-02.) Roatsey reported that Varble had good eye contact and a good affect. (R. at 301.) Roatsey diagnosed knee pain, morbid obesity, anxiety and depression. (R. at 301.) Varble was referred to a social worker. (R. at 301.) On August 27, 2007, Varble reported that she had a low tolerance with people. (R. at 312.) Roatsey reported that Varble's affect was flat. (R. at 312.) On November 5, 2007, Roatsey diagnosed arthralgias at multiple sites, left knee pain, anxiety and depression. (R. at 310. ) Varble reported that she felt better when she took Celexa. (R. at 310.)

On June 25, 2007, Varble saw Crystal Burke, L.C.S.W., a licensed clinical social worker with complaints of anxiety and depression. (R. at 317.) She reported isolating herself and having some obsessive and compulsive thoughts. (R. at 317.) Varble had very poor eye contact, her mood appeared mildly depressed, and she was anxious. (R. at 317.) Burke opined that Varble had some mood disturbance, and she opined that she might have borderline to mild mental retardation. (R. at 317.) Burke noted that further psychological testing would be necessary to make this finding. (R. at 317.) On July 23, 2007, Varble reported increased stress at home. (R. at 316.) She reported that she isolated herself and spent most of her time in her room playing with her "toys." (R. at 316.) Varble stated that she did not like being in public places and believed people were judging her. (R. at 316.) She stated that she worried that people would make fun of her and talk about her. (R. at 316.) She reported that when she was in school, people made fun of her and threw things at her. (R. at 316.) Burke reported that Varble was easily distracted and appeared "quite anxious." (R. at 316.) Burke

opined that Varble needed some psychological evaluation and that she might continue to benefit from counseling to assist with anxiety management. (R. at 316.)

On September 10, 2007, Varble reported that she became anxious and nervous whenever she went out of her home, which caused her to become sick to her stomach. (R. at 315.) Varble stated that her mother and sister had invited a couple of "boarders" to move in with the family for extra money. (R. at 315.) She stated that she did not like having strangers in her home. (R. at 315.) Burke reported that Varble had problems with eye contact, and she appeared anxious and guarded. (R. at 315.) Burke reported that Varble's thoughts and speech appeared very simplistic and that she would benefit from psychological testing. (R. at 315.) On November 5, 2007, Varble reported that she had a birthday and became very upset because she did not have a candle on her cake. (R. at 314.) She reported going to a Halloween carnival and becoming upset because she did not get to play any of the games. (R. at 314.) Burke reported that Varble's thought content and speech were very simplistic and childlike at times. (R. at 314.) Burke also reported that Varble appeared to be limited intellectually. (R. at 314.)

On January 7, 2008, Burke completed a mental assessment indicating that Varble had a satisfactory ability to understand, remember and carry out simple instructions and to interact appropriately with the public, with supervisors and with co-workers. (R. at 318-20.) Burke indicated that Varble had a serious limitation, which resulted in an unsatisfactory work performance, in her ability to make judgments on simple work-related decisions, to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions and to

respond appropriately to usual work situations and to changes in a routine work setting. (R. at 318-19.) Burke reported that Varble could not manage her own benefits. (R. at 320.)

On February 22, 2008, Varble reported that the Celexa was not helping with her symptoms of depression and anxiety. (R. at 339.) On March 10, 2008, Burke reported that Varble appeared depressed, was tearful at times, and her thought content appeared to be rather simplistic and childlike. (R. at 343.)

On April 22, 2008, Burke completed another mental assessment indicating that Varble had a satisfactory ability to understand, remember and carry out simple instructions. (R. at 345-47.) She indicated that Varble had a serious limitation, which resulted in an unsatisfactory work performance, in her ability to make judgments on simple work-related decisions, to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public, with supervisors and with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 345-46.) Burke reported that Varble could not manage her own benefits. (R. at 347.) On February 16, 2009, Burke reported that Varble exhibited mood disturbance and symptoms of a personality disorder, and she encouraged more frequent appointments. (R. at 348.)

On March 6, 2008, Ralph Ramsden, Ph.D., a licensed clinical psychologist, evaluated Varble at the request of Varble's attorney. (R. at 323-30.) The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test was administered, and

Varble obtained a verbal IQ score of 93, a performance IQ score of 80 and a full-scale IQ score of 87, placing her in the low average range of intellectual functioning. (R. at 328.) The Structured Inventory of Malingering Symptoms, ("SIMS"), an objective questionnaire measuring the potential for malingering, was performed, and Varble exceeded the cut-off for the possibility of exaggerating clinical symptoms. (R. at 328.) Ramsden reported that Varble scored "particularly high on measures of affective problems and psychotic features." (R. at 328.) A Personality Assessment Inventory, ("PAI"), was characterized by exaggeration of clinical symptoms found in individuals with an exaggerated "cry for help." (R. at 328.) It revealed the presence of depression and a possible thought disorder with paranoid features. (R. at 328.) It also revealed that Varble had difficulty with interpersonal relationships. (R. at 329.) Varble scored extremely high on the potentials for suicide and aggression. (R. at 329.) Ramsden reported that the PAI results indicated that Varble was an individual who would have limited insight into her psychological problems. (R. at 329.) Ramsden reported that Varble's exaggerated response style suggested that even though she believed she could be a risk to herself or others, some of the aggressiveness was used to manipulate others around her. (R. at 329-30.) He reported that Varble displayed borderline and dependent personality features. (R. at 330.) Ramsden diagnosed a depressive disorder, not otherwise specified, with mood variability, anxiety disorder, not otherwise specified, with features of social avoidance, and personality disorder, not otherwise specified, with dependent and borderline features. (R. at 330.) Ramsden indicated that

Varble had a then-current Global Assessment of Functioning score, ("GAF"),[5] of 40.[6] (R. at 330.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2010).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6]A GAF score of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *See* DSM-IV at 32.

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2010); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d),

416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

By decision dated September 4, 2008, the ALJ denied Varble's claims. (R. at 9-15.) The ALJ determined that the medical evidence established that Varble had severe impairments, namely carpal tunnel syndrome, obesity and depression/anxiety, but he found that Varble's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ also found that Varble had the residual functional capacity to perform unskilled sedentary work performed in a quiet environment with little interaction with supervisors and co-workers. (R. at 14.) Based on Varble's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Varble could perform, including jobs as a pharmaceutical assembler, an office clerk and a toy stuffer. (R. at 14.) Thus, the ALJ found that Varble was not under a disability as defined under the Act and was not eligible for benefits (R. at 14.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

Varble argues that the ALJ's determination of her mental residual functional capacity is unsupported by substantial evidence. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Varble also argues that the ALJ erred by failing to give full consideration to the findings of Ramsden. (Plaintiff's Brief at 6-7.) Varble does not challenge the ALJ's finding as to her physical impairments or her physical residual functional capacity.

Based on my review of the record, I agree that substantial evidence does not support the ALJ's finding with regard to Varble's mental residual functional capacity. I also do not find that substantial evidence exists to support the ALJ's weighing of the medical evidence. As stated above, an ALJ may assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

In this case, the ALJ noted that Varble's alleged symptoms of depression and anxiety were directly attributable to the fact that additional family members were living in her home. (R. at 12.) The ALJ noted that there was no evidence, apart from the psychological evaluation arranged by Varble's attorney, that she had ever been examined by a psychiatrist or psychologist, and that the progress notes from Burke were relatively unremarkable. (R. at 12.) The ALJ noted that "even according appropriate weight to the medical assessment provided by Ms. Burke in January 2008, claimant's capacity for work at the sedentary level of exertion is reduced only by inability to perform more than unskilled work that is performed in a quiet environment with little interaction with supervisors or co-workers." (R. at 12-13.)

In March 2008, psychologist Ramsden diagnosed Varble with a depressive disorder, not otherwise specified, with mood variability, anxiety disorder, not otherwise specified, with features of social avoidance, and personality disorder, not otherwise specified, with dependent and borderline features. (R. at 330.) Ramsden assessed Varble's then-current GAF score at 40, indicating that Varble had some impairment in reality testing or communication or major impairment in several areas,

such as work or school, family relations, judgment, thinking or mood. (R. at 330.) Ramsden's assessment was based on psychological testing, as well as his evaluation of Varble. (R. at 323-30.) In April 2008, Burke reported that Varble had a serious limitation, which resulted in an unsatisfactory work performance, in her ability to make judgments on simple work-related decisions, to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public, with supervisors and with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 345-46.) Burke reported that Varble could not manage her own benefits. (R. at 347.)

While the ALJ noted Ramsden's evaluation, he failed to indicate what weight, if any, he was giving to it or his assessed GAF score. (R. at 11.) The ALJ simply noted that Ramsden's evaluation was arranged by Varble's attorney for the purpose of "enhancing [her] application for benefits." (R. at 12.) Furthermore, the vocational expert testified that Burke's assessment suggested unsatisfactory work performance, which indicated that she could not perform productive work, which would eliminate the ability to perform substantial gainful work activity. (R. at 46-47.)

While the ALJ is not bound to accept a medical source's opinion as to a claimant's residual functional capacity, he must consider any such opinion and explain what, if any, weight was given to it or why he chose to reject it. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also King*, 615 F.2d at 1020. In this case, the ALJ offers no explanation of his weighing of the medical evidence on this issue. Thus, I cannot find that substantial evidence exists in the record to support the ALJ's finding that Varble

had the mental residual functional capacity to perform unskilled sedentary work, and I recommend that the case be remanded to the ALJ for further consideration consistent with this Report and Recommendation.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the Commissioner's mental residual functional capacity finding; and

2. Substantial evidence does not exist to support the Commissioner's finding that Varble was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Varble's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the decision of the Commissioner denying benefits and remand this case to the Commissioner for further consideration consistent with this Report and Recommendation.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:  November 22, 2010.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE